Filed 3/3/23  In re Cameron P. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re CAMERON P., a Person Coming Under the Juvenile Court Law. | B319553<br>(Los Angeles County Super. Ct. No. 19CCJP02712B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>MARTHA P.,<br><br>     Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Rudolph A. Diaz, Judge.  Affirmed.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Bryan Mercke, Associate County Counsel, for Plaintiff and Respondent.

_____

Martha P. (mother) appeals from the juvenile court's orders denying her Welfare and Institutions Code section 388[1] petition with regard to her 14-year-old son, Cameron P. (Cameron). Mother raises two arguments urging reversal: (1) that the juvenile court abused its discretion by summarily denying her petition despite mother's demonstration that her circumstances had changed, and (2) that reunification with mother was in Cameron's best interests because his caregiver had not yet committed to providing a permanent placement for him. Finding no abuse of discretion, we affirm.

**FACTS AND PROCEDURAL BACKGROUND**

**I.    Factual Background**

In April 2019, Cameron's older sister[2] (sister) reported that their mother had told the children that she "want[ed] to die." She also reported that Cameron had found mother collapsed on the stairs after taking a combination of pills and alcohol. He called

_____

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]    Sister was initially included in these dependency proceedings, but has since turned 18. Accordingly, she is not a party to this appeal.

2

911, mother was involuntarily hospitalized, and the children were placed in the care of foster parents.[3]

A referring party gave this information to the Los Angeles County Department of Children and Family Services (DCFS), who opened an investigation into the family.

Investigating social workers found that the family home smelled strongly of urine and was cluttered with unopened mail and unpaid bills.  When a social worker spoke to Cameron, his hands and neck were covered in dirt.  He told the social worker that he only showered once a month and never used the bathroom at home, because there was no soap or toilet paper in the house.  Cameron said that there was usually no food in the house, and that he typically ate either junk food or takeout meals that sister bought from app-based delivery services.  The family's housekeeper confirmed that mother often forgot to give her money, forcing the family to go without basic household items.

Cameron also told social workers that sister essentially raised him, as mother drank often, slept excessively, and "act[ed] weird."  He said that he worried constantly about his mother, had trouble sleeping, and had tried to kill himself the previous year.

Social workers interviewed mother in the hospital.  She confirmed that she had been diagnosed with bipolar and schizoaffective disorder for 30 years.  She admitted that she drank wine and overmedicated every day in an attempt to overcome her suicidal feelings.  She knew that the children worried about her drinking, but believed that they were "resilient" and "old enough" to "care for themselves."

After mother was released from the hospital, social workers interviewed her again at the family home.  Slurring her speech,

---

[3]     The children's father had passed away in 2013.

mother confessed to feeling unstable and suicidal. She admitted that she had totaled the family car a month earlier, and had subsequently been charged with driving under the influence. Yet she did not believe that she had a substance abuse problem, and did not think that she needed to seek treatment for her drinking.

Mother later denied that she was suicidal and that she abused alcohol, and said that she had not been serious when she told the children that she wanted to kill herself.

## II. Procedural Background

### A. *Jurisdiction Petition*

DCFS filed a section 300 petition alleging that mother's untreated substance abuse and mental health issues placed the children at risk of serious physical harm.

In June 2019, the juvenile court sustained both the substance abuse and mental health allegations against mother. Mother was given family reunification services and twice-weekly monitored visitation, and was ordered to participate in an alcohol rehabilitation program, a 12-step program, weekly testing, and counseling.

### B. *Reunification Services*

Mother's compliance with her case plan was inconsistent from the start. She immediately enrolled in an alcohol program, but returned both missed and diluted drug and alcohol tests. She participated in counseling, including conjoint counseling with Cameron, but only partially exercised her visitation rights, visiting the children once per week.

The children stated that they did not want more visits, and both opposed extended visitation over the 2019 holiday season. They both wanted to stay with their foster parents if they could not be reunited with mother.

In early 2020, mother briefly returned a series of clean drug and alcohol tests, only to resume providing diluted or missed tests from March through June.

DCFS temporarily allowed mother to have unmonitored visits with the children, but reverted to monitored visitation after only three visits in which mother showed up appearing lethargic and off-balance, slurring her speech, crying, and insulting and yelling at the children.

At one unmonitored visit in May 2020, mother struggled to get out of her car, eventually falling and sustaining a minor head injury. The children reported that she seemed "highly sleepy" and potentially medicated during the visit. DCFS later learned that, upon returning home from this visit, mother totaled her car. Mother initially reported that the accident involved another car and that both parties were at fault; DCFS later learned that no other parties were involved, and that mother had crashed the car into the wall of her parking garage.

Mother had stabilized by November 2020, with DCFS reporting that she was consistently participating in required mental health services. However, the children steadfastly objected to reuniting with mother. When DCFS attempted unmonitored visitation for a second time in February 2021, the children quickly asked to return to monitored visitation because mother was argumentative and made them feel uncomfortable.

Both children continued to attend once weekly monitored visits with mother, but "adamantly opposed . . . increasing the frequency or duration of [the] visits" as they "d[id] not want to be alone with their mother again." Conversely, sister said that Cameron was flourishing with their foster family. Cameron

agreed, telling DCFS that he wanted to be adopted by his foster parents.

### C.   *Termination of Reunification Services*

By March 2021, mother was regularly missing up to 50 percent of her drug and alcohol tests and had stopped providing progress updates from her drug and alcohol program. She was no longer in conjoint counseling with Cameron because he refused to participate.

At the status review hearing on March 22, 2021, the juvenile court found that mother was out of compliance with her case plan, noting her failure to test consistently and her inappropriate behavior with the children over the past 22 months. The court concluded that the children's "stability [would be] jeopardized if they are returned to mother's custody," terminated family reunification services, and set a section 366.26 hearing.

### D.   *Section 366.26 Hearing Continuances*

The trial court initially set a section 366.26 hearing for August 2021, but granted multiple continuances to allow the children's foster mother to receive necessary paperwork, and to determine whether adoption or legal guardianship was most appropriate for the children.[4] The hearing would ultimately take place in March 2022.

In the year between termination of reunification services and the section 366.26 hearing, mother's presence in Cameron's life remained inconsistent. In March 2021, Cameron refused monitored visits with mother more than once per month. Then,

---

[4]   Among other things, the children's foster mother had yet to receive the divorce decree from her prior marriage. There were also difficulties obtaining the children's father's death certificate.

in May 2021, mother stopped visiting altogether when her mental health deteriorated, subsequently informing DCFS that she was "not yet stable" enough to arrange monitored visits with the children.

In July 2021, mother was briefly hospitalized for psychiatric issues. In September 2021, mother was hospitalized again, this time for five weeks. She attempted weekly telephonic visits with Cameron, but he was upset by her slurred speech and apparent sedation. When mother was released from the hospital in October 2021, Cameron would only participate in once monthly visits, stating that he could not "handle" more. He refused to attend visits without sister.

Although Cameron told mother that he did not want her to contact him directly outside of visitation, Mother attempted to call and text Cameron multiple times per week. Cameron reported being upset by the calls, as mother was often "moody," repeated herself often, and seemed to forget everything that Cameron told her from call to call.

Throughout, Cameron consistently expressed his desire to be adopted by his foster parents.

### E.    *Section 388 Petition*

On March 10, 2022, mother filed a section 388 petition asking for reinstatement of reunification services with Cameron. She presented evidence that she had been actively participating in mental health services with a local hospital since November 2021, had been in therapy since July 2019, had begun regularly participating in AA meetings, and had allegedly maintained sobriety since October 26, 2021. She argued that reunification would be in Cameron's best interest, as it would keep him connected with mother and her extended family. Mother also

7

insisted that Cameron was unsure of whether he wanted to be adopted by his foster parents.

At the section 366.26 hearing, the juvenile court heard arguments on whether a hearing should be set for her section 388 petition. Mother's counsel argued that she was currently participating in mental health services and had established a period of sobriety. DCFS and Cameron's counsel opposed the hearing.

The juvenile court summarily denied the section 388 petition, stating that mother had not "reached the threshold showing" to warrant a hearing. The court explained that mother had not demonstrated a true change of circumstances, as her evidence only showed that she was still engaged in the therapeutic and psychiatric services that she had been participating in, on and off, for the last two years. The court also concluded that reunification was not in Cameron's best interests, finding that mother's "interpretation of [his] desires to be adopted are incorrect," as the record showed that Cameron had repeatedly and firmly expressed a desire to be adopted by his foster parents.

**F.** *Appeal*

Mother timely appealed.

## DISCUSSION

Mother argues that the juvenile court abused its discretion in denying mother's section 388 petition without a hearing.

## I. Applicable Law

Under section 388, subdivision (a)(1), a parent or other interested party may petition the juvenile court to change, modify, or set aside a previous order in dependency proceedings. "The petitioner has the burden of showing by a preponderance of the evidence (1) that there is new evidence or a change of

8

circumstances and (2) that the proposed modification would be in the best interests of the child." (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615 (*Mickel O.*).)

To satisfy the first prong, "the change in circumstances must be substantial." (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.) Merely changing—as opposed to changed— circumstances will not suffice. (*Mickel O., supra,* 197 Cal.App.4th at p. 615.)

For the second prong, specifically when determining whether reinstatement of reunification services is in the best interests of the child, the juvenile court must consider whether "the specific factors that required placement outside the parent's home" have been remediated and prioritize "the goal of assuring stability and continuity" for the child. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 463–464.) "[A]fter reunification services have terminated, a parent's petition for . . . reopening reunification efforts must establish how such a change will advance the child's need for permanency and stability." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527 (*J.C.*).)

## II.    Standard of Review

We review the denial of a section 388 petition for abuse of discretion. (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 642 (*Marcelo B.*).) "An abuse of discretion occurs when the juvenile court has exceeded the bounds of reason by making an arbitrary, capricious or patently absurd determination." (*Ibid.*)

"It is rare that the denial of a section 388 motion merits reversal as an abuse of discretion." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 522.)

9

## III.   Analysis

Mother failed to show either a substantial change of circumstances or that reunification would be in Cameron's best interests.  Accordingly, the juvenile court did not abuse its discretion in denying her section 388 petition.

### A.   *Change of circumstances*

To support her claim of changed circumstances, mother asserted that she had stayed sober for five months preceding the permanency hearing and that she was currently participating in treatment for her psychiatric and mental health issues.[5]

But there is nothing new about these circumstances; mother had often undergone periods of full or partial sobriety and treatment in the two years since the juvenile court took jurisdiction.  At two separate points, mother even stabilized sufficiently that DCFS allowed her to have unmonitored visitation with Cameron.  Each time, mother's mental health and substance abuse issues quickly reasserted themselves and derailed her reunification process.[6]  Given this history, it was not unreasonable for the juvenile court to be cautious in viewing the

---

[5]   Notably, mother did not provide any independent proof of her sobriety—such as negative drug and alcohol tests—but instead relied on the testimony of her AA sponsor, who believed that she had remained sober since her release from the hospital.

[6]   Mother argues that her alcohol abuse problems were not as longstanding as those faced by other parents who have struggled with years or decades of substance abuse, as in *In re Ernesto R., supra,* 230 Cal.App.4th 219, and that her relatively short period of sobriety is thus a significant change.  This assertion ignores mother's recent history of sporadic sobriety followed by significant relapses.

extent to which mother had resolved the underlying problems leading to Cameron's dependency. (*In re N.F.* (2021) 68 Cal.App.5th 112, 122 [the petitioning mother's "brief period of sobriety and completion of a treatment program was only the most recent attempt in a series of unsuccessful attempts to overcome" the issues leading to dependency, so "her recent completion of yet another program did not constitute a material change in circumstances"].)

The bottom line is that, at most, mother presented evidence of changing—rather than substantially changed—circumstances in her life, which was insufficient to meet her burden under section 388. (*Mickel O.*, *supra*, 197 Cal.App.4th at p. 615.)

Accordingly, it was not "arbitrary, capricious or patently absurd" (*Marcelo B.*, *supra*, 209 Cal.App.4th at p. 642) for the juvenile court to deny the petition.

## B.    *Cameron's best interests*

While we could affirm the denial of mother's section 388 petition based on the absence of changed circumstances alone, we also find no abuse of the juvenile court's discretion in concluding that Cameron's best interests would not be promoted by further reunification services.

Mother's petition was filed one year after the termination of family reunification services. Therefore, it was her burden to rebut the strong presumption that Cameron's best interests were served by remaining with his foster parents. (See *Angel B.*, *supra*, 97 Cal.App.4th at pp. 464–465.) To do so, mother was required to "make some factual showing that the best interests of [Cameron] would be served by modification" (*id.* at p. 465) such that it outweighed his "constitutional and statutory interest in stability" (*In re Jasmon O.* (1994) 8 Cal.4th 398, 421).

11

Mother failed to make such a showing. Her assertions that Cameron would benefit from "remain[ing] connected to mother and [his] maternal family" do not come close to overcoming the presumption that remaining with his foster parents—who sister credited with allowing Cameron to thrive as never before—and moving ahead with permanency planning were in his best interests, especially compared to the instability and impermanence that Cameron would likely face if reunification services were reinstated.

On appeal, mother relies on the same faulty assertions that underlie her section 388 petition. She insists—without evidentiary support—that Cameron expressed uncertainty about staying with his foster parents. In fact, Cameron vociferously and consistently indicated his desire for permanency with his foster family.

And, rather than demonstrate how reunification with mother would promote Cameron's need for stability and permanence, mother attacks his foster parents' cautious approach to adoption. She argues that, because his foster parents were still attempting to determine whether legal guardianship or adoption was the best solution for Cameron, his foster placement does not offer sufficient permanency to offset the nebulous benefits of continued reunification.

Her argument is singularly unpersuasive. Uncertainty about the legal form which permanency with his foster family will take does not diminish the basic stability that Cameron experiences with his foster family, or suggest that mother should be permitted to render his future with them uncertain. "Children need stability and permanency in their lives, not protracted legal

12

proceedings that prolong uncertainty for them." (*In re Justice P.* (2004) 123 Cal.App.4th 181, 191.)

Under the circumstances presented here, the juvenile court properly found that granting appellant's section 388 petition was not in Cameron's best interests.

## DISPOSITION

The orders are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
ASHMANN-GERST


We concur:


_____, P. J.
LUI


_____, J.
CHAVEZ